**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-17-678 |
| | § | |
| | § | |
| CRISTOFER JOSE GALLEGOS-ESPINAL | § | |

## Memorandum Opinion and Order

Pending before the court is a sealed motion to suppress evidence filed by defendant Cristofer Jose Gallegos-Espinal ("Gallegos"). Dkt. 26. The court held a hearing on the motion on April 16 through April 17, 2019. After considering the motion, response, record evidence, testimony at the hearing, and applicable law, the court is of the opinion that the motion to suppress should be GRANTED IN PART AND DENIED IN PART.

### I. BACKGROUND

On September 19, 2017, Gallegos received a call at work from his brother's phone. Dkt. 26, Ex. 1 (Gallegos Dec.). When he answered the call, a law enforcement agent was on the other end of the line. *Id.* At the hearing, Department of Homeland Security ("DHS") Border Patrol Agent Raul Cardenas testified that he was the agent who spoke with Gallegos on the phone. Cardenas asked Gallegos to return to the house Gallegos shared with his mother and others because his mother had requested for him to come home.[1] When Gallegos arrived home, he was approached by DHS

---

[1] Gallegos's mother had requested that Gallegos take custody of his younger siblings because she was being arrested. However, at some point the Department of Family and Protective Services representatives, who were involved because DHS agents knew Gallegos's mother had minor children, learned that Gallegos was a minor target in the case relating to his mother's unlawful activities and requested that a different family member take custody of the minor children.

1

Deportation Officer Abilio Mendiola. *Id.* Gallegos contends that there were a lot of law enforcement cars at the house and that the agent who approached him searched his person and then asked if he (the agent) could search Gallegos's car.[2] *Id.* At the hearing, Mendiola testified that Gallegos was patted down for officer safety because the officers were in the midst of executing a search warrant related to allegations that Gallegos's mother and her boyfriend were involved in an alien smuggling operation. Agents searched Gallegos's car when he arrived just to verify that there were no weapons because they were in the midst of executing a search warrant. Mendiola testified that he then escorted Gallegos into the house and brought him to Agent Richard Newman, who was the case agent. Gallegos contends that an agent told him, after the pat down, to go inside the house and "sit and not speak to any of [his] family members."[3] *Id.* Gallegos's mother was in handcuffs and was eventually taken away. *Id.* His 18-year-old brother was also arrested. *Id.* His youngest brother, who was not yet old enough to go to school, was at home while the search warrant was being executed. Gallegos was told at some point that he was there to take custody of this younger sibling.

## A.    Consent to Search of Car and Gray Samsung Cell Phone

Gallegos contends that about ten minutes after he arrived he was asked if he would allow a search of his car and smartphone. Dkt. 26, Ex. 1. It seems this was the second search of his car. Gallegos asserts that his gray Samsung cell phone was originally in his car. *Id.* During the hearing, agents testified that the gray Samsung was on Gallegos's person, not in the car. Regardless of

---

[2] During the hearing, the testimony was relatively consistent that there were about twenty law enforcement officers at the address.

[3] During the hearing, Newman testified that Gallegos was free to speak to his mother and brother and that, in fact, at some point his mother gave Gallegos her wallet, ATM card, and cash to help pay for the needs of his younger siblings. Other agents also testified that Gallegos spoke briefly to his mother about financial matters related to caring for his siblings.

location, Gallegos contends that he did not think he had the choice to refuse the search of his car and gray Samsung cell phone, as he was "surrounded by many armed agents, [and his] mother was arrested." *Id.* Gallegos asserts that he was presented with a form and he signed where they showed him to sign. *Id.* He contends that he was not informed that agents would be downloading all of the information on the phone; he thought they were just going to look through his contacts. *Id.*

Newman testified that he wanted to search Gallegos's phone because he believed Gallegos was involved in his mother's unlawful activities (as a minor player) and he wanted to obtain additional evidence. However, he did not want to alert Gallegos that he was searching for this type of information, so he made up a story about needing to confirm that there was no child pornography on the phone because Gallegos would be taking custody of his younger sibling. Several agents testified that Gallegos and the agents or officers in the vicinity chuckled when Newman said this.[4] Mendiola, ICE Deportation Officer Chris Sandoval, and U.S. Border Patrol Supervisor Rodolfo Hernandez, Jr., all testified that they heard Gallegos give Newman verbal consent to search the Samsung cell phone and his vehicle. Newman testified that he obtained verbal consent for the search from Gallegos and then used a standard written consent form to ensure that it was documented. Newman testified that he knew Gallegos read the form because Gallegos had to read it to know where to write his name and the make and model of his vehicle and phone. Mendiola and Sandoval witnessed Gallegos signing the form, and they testified that Gallegos did not have any questions and said yes when asked if he understood the form. Sandoval testified that Newman did not warn Gallegos about any data being extracted from the phone.

---

[4] Gallegos appears to question the veracity of Newman's story about telling Gallegos that they were going to search for child pornography in his briefing (*see* Dkt. 26), but there was substantial credible testimony at the hearing that Newman indeed used this ruse.

**B.      Consent to Search the White iPhone**

Mendiola and Agent John Gilbert searched the car.  Mendiola testified that he found a white iPhone on the front floor panel.[5]  After the car was searched for a second time, Gallegos contends that an agent asked him if the Samsung Galaxy phone was his, and he replied in the affirmative.  *Id.*  The agent then held up an iPhone that had been found in the car, and Gallegos informed the agent that the iPhone was his prior smartphone and it did not have a service plan.  *Id.*  According to Gallegos, the agents asked if they could search the iPhone and asked for the passcode.  *Id.*  Gallegos again contends that he did not think he could refuse, and he gave the agents the passcode.  *Id.*  Gallegos asserts that the agent wrote the iPhone and passcode on the earlier-signed consent form and did not ask Gallegos to initial it or sign again.  *Id.*

U.S. Border Patrol Agent Ruben Mendoza testified that Gallegos gave him verbal consent to search the iPhone and he (Mendoza) added the iPhone to the written consent form.  Cardenas testified that he asked Mendoza to find out if the iPhone had a code, and that Gallegos said it did.  Newman testified that Gallegos wrote the PIN on the consent form after Newman asked him to do so.  Cardenas then took possession of the iPhone.

**C.      Use of the Cellebrite Device at the House**

According to testimony at the hearing, Cardenas at some point hooked the gray Samsung phone up to an electronic device called a Cellebrite to extract data from the Samsung.  Newman testified that Gallegos was standing near the door to the dining room when the extraction began, and Cardenas was extracting the data at the kitchen table.  Another agent confirmed these locations

---

[5]  Gallegos contends in his declaration that the iPhone was in his backpack in the car. Dkt. 26, Ex. 1.

during his testimony. Since it was an open floor plan, Newman was certain that Gallegos, who was perhaps fifteen feet away, could see the phone being hooked up to the Cellebrite device. Hernandez testified that Gallegos could definitely see the extraction of data from the gray Samsung taking place; he said it took perhaps forty-five minutes to an hour to extract all the data. He also testified that at some point Gallegos was actually sitting at the table where the extraction was taking place and that he could clearly see the agent connecting wires to the gray Samsung phone. Hernandez asserted that he did not believe the Cellebrite could be mistaken for a battery because it looks like a box with a screen or monitor and looks "techy."

Mendoza testified that he had been involved in searching the house when Gallegos arrived, but when he later entered the kitchen, Gallegos was standing catty corner to the agent who was in the process of extracting data from Gallegos's gray Samsung phone.[6] Cardenas, who was performing the extraction, testified that at some point during the extraction Gallegos walked into the kitchen by the kitchen table, where he was extracting data from Gallegos's phone. According to Cardenas, Gallegos would have seen his phone hooked up to the device. Cardenas performed a "logical extraction" of the gray Samsung phone at the house. According to Cardenas, a logical extraction downloads what one would see if one were on the phone, as opposed to a "physical extraction," which would also download

---

[6] Mendoza testified that at this point Gallegos actually had the white iPhone in his pocket, and Mendoza saw Gallegos pull the cell phone partially out of his pocket. This was when Cardenas was extracting data from the gray Samsung. Mendoza testified that he questioned Gallegos about the iPhone, and Gallegos said the phone was not active. Gallegos then gave Mendoza verbal consent to search the iPhone. Cardenas told Mendoza to add the white iPhone to the consent form, which Mendoza did. Mendoza then gave the phone to Cardenas. While it is not altogether clear, the testimony at the hearing indicates that the white iPhone was originally placed on the table with other evidence when it was found in Gallegos's car, and then somehow ended up in Gallegos's pocket before Mendoza saw it and requested consent to search.

deleted items, or a "file extraction," which goes through and extracts information from all of the phone's files.

The Government contends that the consent form that Gallegos signed is broad enough to encompass a forensic search, and Gallegos contends that he did not consent to data extraction. Dkts. 26, 27. Newman testified that he did not go into specifics about using the Cellebrite to extract data from the phone when obtaining consent to search from Gallegos because it can "unnerve" people and sometimes the person consenting will object to the use of the Cellebrite or to a forensic search. He said that he likes to "be vague" so that he can use the Cellebrite and that if they object when the Cellebrite is being used, he would stop and just thumb through the phone physically. Newman testified that he "absolutely" would have looked at the photos in Gallegos's photo gallery manually if Gallegos had objected to the Cellebrite.

**D.     Interview and Use of Cellebrite Device at HSI Office**

According to Hernandez, after the initial extraction of data from the gray Samsung, they were the last ones left at the house, so they asked Gallegos if he would mind following them to the Homeland Security Investigations ("HSI") building. Gallegos contends in his declaration that he was told that he needed to drive immediately to the agents' offices to retrieve his little brother or the brother would be turned over to Child Protective Services ("CPS"). Dkt. 26, Ex. 1. Newman testified that he asked Gallegos if he would consent to an interview at the HSI office and if Gallegos would meet them there so that Newman could conduct the interview and they could finish searching the phones, and Gallegos consented. Gallegos drove his own vehicle to the office and met the agents there. Cardenas performed a file extraction on the gray Samsung cell phone first and then started

a logical extraction of the iPhone while Gallegos was being interviewed. The extractions at the HSI office did not take place in the same area as the interview.

Newman testified that Gallegos was very cooperative during the interview at the HSI office. They gave him the *Miranda* warning, just in case, but Gallegos was free to go after the interview, and they gave both phones back to him after the interview. According to testimony at the hearing, Gallegos was not informed that the government would be keeping the data from his phone. Newman testified that he believed Gallegos would have known this because he saw them using the Cellebrite machine.[7]

## E. The Consent Form

The consent form Gallegos signed is DHS U.S. Immigration and Customs Enforcement Form 73-005. Dkt. 26, Ex. 3. The testimony at the hearing revealed that this is the consent form the agents always use for searches like this. The first sentence of the form, which has blanks for names of the person consenting and the ICE special agent, states that Gallegos had been informed by Newman of his "right to refuse to consent to a search of [his] property, described as: (item, place, things to be searched, location, etc.)." *Id.* A blank after this statement is completed with the following text: "car scion XD 2008 & gray SamSung and white Iphone" followed by some numbers. *Id.* It then states that Gallegos had been advised by Newman that "if I consent to a search of this property, anything discovered during this search may be used against me in any criminal, civil, or administrative proceedings." *Id.* The next sentence states that Gallegos had "decided to allow ICE Special Agents Newman and Cardenas (BPA) to conduct a complete search of [his] Phone & car

---

[7] At the hearing, Gallegos's counsel asked Newman why he thought somebody's mind would immediately go to "they're doing a James Bond on my telephone to extract everything," and Newman testified that that is what he would assume if his phone were hooked up to a machine.

located at [his mother's address]." *Id.* The names and "Phone & car" and the address were all filled in blanks on the preprinted form. The form then states that the agents "are authorized by me to take any letters, papers, materials, or other property which they may desire to examine." *Id.* In the signature block, the form states that the person consenting "voluntarily and intentionally consent[s] to allow ICE to search [his] property" and that his consent was "freely given and not the result of any promises, threats, coercion, or other intimidation." *Id.* Gallegos signed the form, and Mendiola and Sandoval signed the form as witnesses. *Id.* It was noted during the hearing and in the briefing that the blank on the form relating to allowing Newman and Cardenas to "conduct a complete search" only said "phone & car" in the singular; no "s" was added to "phone" on this portion of the form when the white iPhone and its password were added to the form. *See* Dkt. 26.

## F.    The Unexpected Evidence

According to Newman, he received a phone call a couple of days after they executed the search warrant at Gallegos's mother's house and interviewed Gallegos from Border Patrol Agent Pete Villarreal, who had been performing a forensic search of the data downloaded from Gallegos's iPhone and informed Newman that there was child pornography on the device. *Id.* Newman viewed the material, and he and the other agents wrote down what they viewed. *Id.* Then, he took the extraction to HSI Special Agent Joe Mirino in Brownsville because Mirino is an agent who works on child pornography cases. Agent Mirino performed a forensic examination of the extraction and, in his forensic report, indicated there were three videos of child pornography in the extraction. Agent Mirino testified that these videos were located in the photo gallery area of the phone and had not been deleted. After confirming the three files contained child pornography, Agent Mirino

8

bookmarked the videos and generated a digital report.  He preserved the evidence in a hard format on an evidence DVD.

Newman next contacted special agent Richard Wilfong, a Special Agent in the Cyber Investigation Group of DHS, HSI in Houston, and other agents at the HSI office in Houston, and Newman informed them that they had discovered child pornography while conducting a search warrant in Houston.  The evidence DVD created by Mirino was later sent via Federal Express to Wilfong.

**G.    The Search Warrant for the iPhone**

After identifying and interviewing the victim in the child pornography videos found on Gallegos's iPhone, Wilfong obtained a search warrant for the iPhone on October 13, 2017.  He wanted access to the iPhone so that he could identify where the videos were created and determine if they had been distributed to anyone.  He sought the warrant to search for images, video, files of child pornography, and file paths or any indications of distribution.  Wilfong stated in his search warrant affidavit and testified that in his experience people who have an interest in child pornography will keep the material as long as they can, so he expected Gallegos would have the iPhone on his person or nearby.  *See* Gov't Ex. 2 (Dkt. 32-1) (search warrant affidavit).  He also noted that from his experience people with these interests treat their collections as prized possessions and as a means of gaining acceptance from others with similar interests.  Wilfong's belief that Gallegos was the perpetrator in the videos and had a sexual interest in children and would therefore have these characteristics, a belief that was buttressed by the fact that Gallegos kept the iPhone even though it had no service plan.

The search warrant application requests the affiant to "[i]dentify the person or describe the property to be searched and give its location." *Id.* Wilfong did not know where Gallegos resided when he sought the search warrant,[8] he only knew his place of business. However, while Wilfong did not know exactly where the iPhone was geographically, he had a strong suspicion that it was on Gallegos's person given the characteristics of people who have a sexual interest in children, and he knew that Gallegos was working in the Houston area.

Wilfong obtained the search warrant from Magistrate Judge Dena Palermo on October 13th and executed it on October 19. The search warrant was to be executed in the Southern District of Texas on or before October 27, 2017, and was for an Apple iPhone bearing a specific serial number. Dkt. 32-1, attach. A. The "items to be searched for and seized" were "[i]mages of child pornography and files containing images/videos of child pornography, and evidence of coercion or enticement of minors in any form"; and "[d]ata indicating when and/or where files and/or applications were created, uploaded or installed" on the iPhone. Dkt. 32-1, attach. B. Since the agents could not find Gallegos's residence, they initially talked to him about the search warrant at his place of business. Gallegos told them that the iPhone was at his aunt's house, where he had been living, and he specified where the phone was at the house. According to Gallegos, the agents executing the search warrant asked him about the information found on the iPhone and did so without any *Miranda* warnings, and the interview was accusatory in tone. Dkt. 26. The agents went to Gallegos's aunt's house, but they could not find the iPhone. The agents waited for Gallegos to return from work. When Gallegos got there, Gallegos told the agents that he had forgotten that the phone was actually

---

[8] The family had moved out of the house where Gallegos's mother had been arrested.

in his car at work. The iPhone had been reset to factory standards. Gallegos asserted that he was going to sell the phone to someone at work and had reset it that morning.

Gallegos contends that the agents threatened him and that he was scared and intimidated. Dkt. 26. Gallegos told the agents that he had no involvement with child pornography, and Wilfong invited him to do a polygraph. Gallegos appeared at the HSI office the next day for a polygraph, and he made certain admissions following the polygraph.

## H.     The Parties' Arguments

Gallegos now moves to suppress the evidence found on the iPhone and all of the "fruit from the poisonous tree" that was obtained due to the initial allegedly unlawful search. Dkt. 26. He additionally contends that the search warrant is deficient because it does not allege the location of the iPhone. *Id.*

The Government argues that Gallegos voluntarily gave consent to search the car and both phones and that Gallegos should have limited the scope of his consent after he saw the Cellebrite machine if he did not consent to a forensic search. The Government asserts that the search warrant was valid because Wilfong's affidavit has sufficient particularity with regard to the mobile device at issue and that even if it were not, the good faith exception should apply because Wilfong believed the consent was valid and the affidavit was sufficiently particular.

Gallegos argues that he signed a generalized form under trying circumstances, that he was never told there was going to be an extraction of data that the Government could keep forever, and that a reasonable person would not believe that the data was going to be extracted and that the Government could just keep it forever. He additionally argues that consent cannot reasonably be implied from the suspect's silence or failure to object, so he did not have an affirmative duty to say,

"Hey, what's that machine? Why is it attached to my phone?" According to Gallegos, these things should have been explained if they wanted voluntary consent in the first place. Moreover, the consent form cannot be read to apply to a complete search of both phones because it is clear the iPhone was not originally part of the consent.

With regard to the search warrant, Gallegos contends that you have to have probable cause not only to search but also as to the location. It does not matter that it is a cell phone. Finally, he contends that the good faith exception cannot cure fruit from a poisonous tree–all of the information Wilfong based the search warrant affidavit on was from a bad consent, which led to viewing videos based on an invalid consent, which led to the search warrant affidavit and all of the subsequent events. Gallegos asserts that the fact that a judge signed the warrant does not fix the fruit of the poisonous tree information used to get the warrant and it does not fix the fact there was no location in the affidavit.

In rebuttal, the Government reiterates that the state of the current law is that consent is valid for extraction from a cell phone as well as a manual search. Moreover, the Government argues that the good faith exception should apply to the search warrant and that the warrant was appropriate with regard to particularity of place because the "place" was the cell phone, where the child pornography could be found.

The motion to suppress is ripe for disposition. The court will first set forth the legal standard and then determine whether the evidence should be suppressed.

## II. LEGAL STANDARDS

Under the Fourth Amendment to the United States Constitution, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The 'basic purpose of this Amendment' . . . 'is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citations omitted). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577 (2016)).

### A. Consent

A search pursuant to consent is "one of the well-settled exceptions to the Fourth Amendment warrant requirement." *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041 (1973). When the government asserts that it had consent for a search, it "has the burden of proving that consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788 (1968). Whether consent is voluntary must be determined from the totality of circumstances. *Schneckloth*, 412 U.S. at 227. Courts in the Fifth Circuit consider the following six factors when considering the totality of circumstances:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995). All of these factors are "highly relevant," and "no one of the six factors is dispositive or controlling of the voluntariness issue." *Id.* (citations and quotations omitted).

Since the Fourth Amendment specifically prohibits *unreasonable* searches and seizures, the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S. Ct. 1801 (1991). Consensual searches are permissible because "it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." *Id.* at 250–51. The scope of that consent is likewise measured under a reasonableness standard—"what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251. The scope is "'*not* to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer.'" *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003) (quoting Wayne R. LaFave, *Search and Seizure* § 8.1 (3d ed. 1996 & Supp. 2003)).

Consent may be "limited, qualified or withdrawn" by the person who originally consented. *Mason v. Pulliam*, 557 F.2d 426, 428 (5th Cir. 1977). A "failure to object to the breadth of a search is properly considered 'an indication that the search was within the scope of the initial consent.'" *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995) (quoting *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994)); *see United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005) ("It

is the defendant's responsibility to limit the scope of the search if he so intends."); *see also United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018) ("It is well established that a criminal suspect may limit the scope of consent to a search . . . but the burden is on him to do so." (citations omitted)). If a defendant fails to limit the scope of a search, "the question that remains in determining its validity is whether, under the totality of the circumstances, the search was reasonable." *Mendez*, 431 F.3d at 427.

**B.    Warrant–Particularity as to Place**

The Fourth Amendment requires that the warrant be particular as to place to be searched and persons or things to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 557, 124 S. Ct. 1284 (2004) (finding that the search warrant in that case identified the place but no description of the evidence sought). This requirement prevents a "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022 (1971); *see United States v. Oglesby*, No. 4:18-CR00626, 2019 WL 1877228, at *3 (S.D. Tex. Apr. 26, 2019) (Ellison, J.) (quoting *Coolidge* and ultimately granting a motion to suppress because a search warrant was not particular as to what data on a cell phone could be seized). The Magistrate, when issuing a warrant, must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317 (1983). The reviewing court must "ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S. Ct. 725 (1960)).

## C.     Warrant–Good Faith Exception

The U.S. Supreme Court has "established an exclusionary rule that goes back to at least 1914 and that, when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139, 129 S. Ct. 695 (2009) (citing *Weeks v. United States*, 232 U.S. 383, 398, 34 S. Ct. 341 (1914)). The "exclusionary rule" is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613 (1974). "The exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called "'fruit of the poisonous tree."'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380 (1984)). It has "never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *Calandra*, 441 U.S. at 348. "Standing to invoke the rule has . . . been limited to cases in which the prosecution seeks to use the fruits of an illegal search or seizure against the victim of police misconduct." *United States v. Leon*, 468 U.S. 897, 910, 104 S. Ct. 3405 (1984). However, "[e]ven defendants with standing to challenge the introduction in their criminal trials of unlawfully obtained evidence cannot prevent every conceivable use of such evidence." *Id.*

Over time, the U.S. Supreme Court has applied a "'good faith' exception across a range of cases." *Davis v. United States*, 564 U.S. 229, 238, 131 S. Ct. 2419 (2011). The good faith exception allows admission in the prosecutor's case in chief of "reliable physical evidence seized by officers reasonably relying on a warrant issued by a detached and neutral magistrate." *Leon*, 468 U.S. at 913. However, the exception does not apply:

> (1) when the issuing magistrate was misled by information in an affidavit that the affiant knew or reasonably should have known was false; (2) when the issuing magistrate wholly abandoned his judicial role; (3) when the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable; and (4) when the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid.

*United States v. Woerner*, 709 F.3d 527, 533–34 (5th Cir. 2013) (citing *Leon*, 468 U.S. at 921–25).

In these situations, the court must determine "whether Fourth Amendment interests will be advanced"; "suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule"—deterring conduct in violation of the Fourth Amendment. *Leon*, 468 U.S. at 915–16, 918. In most cases where "an officer acting in objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," "there is no police illegality and thus nothing to deter." *Id.* at 920–21.

In *United States v. Massi*, the Fifth Circuit considered whether to apply the good faith exception to admit evidence obtained from a search warrant that relied on an affidavit resulting from an unlawful detention in violation of the Fourth Amendment. 761 F.3d 512, 519–20 (2014). The defendant argued that an unlawful detention tainted any evidence resulting from the search warrant and that the evidence should therefore be excluded as fruit from the poisonous tree. *Id.* at 520. The Fifth Circuit determined that the initial detention of the defendant was lawful, but there was no probable cause to detain and essentially seize him while law enforcement was obtaining a search warrant, which took several hours. *Id.* at 520–24. The defendant thus sought to exclude the evidence obtained in the search; the Government argued that the search was done pursuant to a warrant and the good faith exception to the exclusionary rule should apply. *Id.* at 524–25. The Fifth

Circuit, after discussing the good faith exception extensively, adopted two requirements for evidence that would otherwise be fruit of a poisonous tree but was obtained as the result of the execution of a search warrant to be admissible. *Id.* at 528. First, "the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be 'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct." *Id.* Second, "the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*." *Id.* Specifically, the "officer presenting the information to the magistrate [must] be objectively reasonable in concluding that the information being used to support the warrant was not tainted." *Id.*

### III. ANALYSIS

The court will first determine whether Gallegos's consent was freely and voluntarily given and whether the scope included a forensic search to be conducted at a later date. Then, the court will determine whether the search warrant affidavit was sufficiently particular as to place and, if the court finds the consent was not valid, it will determine whether the good faith exception saves the evidence obtained as a result of executing the search warrant.

### A. Consent Freely and Voluntarily Given

The court must weigh the six factors in *Jenkins* to determine if the consent in this case was freely and voluntarily given under the totality of the circumstances. *See* Part II.A, *supra*.

### 1. The Voluntariness of Gallegos's Custodial Status

First, the court considers whether Gallegos was in custody when he consented to the search. *Jenkins*, 46 F.3d at 451. The Government argues that Gallegos was not under arrest and went to the

house voluntarily because his mother wanted him to come. He was only escorted into the house because a search of the residence was ongoing. He also freely traveled to the HSI office to continue his interview and allow the Government to continue its search of the phones. Dkt. 27 at 7–9. Gallegos points out that when he got to the house, there were law enforcement vehicles everywhere and he was patted down and escorted inside. His mother was under arrest and the house was being searched. He contends he was told to sit and not allowed to talk to his mother. He argues that he was "clearly not free to leave." Dkt. 26 at 25.

The court agrees with the Government that Gallegos went to his mother's house because his mother needed him to take custody of his younger sibling and he was free to leave at any time. In his declaration, he states that he did not believe he was free to leave because he needed to care for his sibling and because there were a lot of armed officers at his mother's house who had arrested both his mother and his brother. Dkt.26. Ex. 1. However, the agents who testified all indicated that Gallegos was free to leave at any time. While a reasonable person may not feel inclined to leave due to a concern that his or her sibling will not have anybody to care for him or her, this interest is separate from whether Gallegos was actually being detained. And the court is not concerned that Gallegos was "escorted" into the house because the officers were in the midst of executing a search warrant and needed to ensure officer safety and guard any potential evidence in the house. The court finds that Gallegos was at the location voluntarily at the time he consented to the search of the evidence at issue. This factor weighs in the Government's favor.

### 2.      Presence of Coercive Police Procedures

The court next must consider whether the agents used any coercive police procedures. *Jenkins*, 46 F.3d at 451. The Government argues that Gallegos was never threatened or forced to

consent, and the ruse regarding needing to look for child pornography was not coercive or threatening. Dkt. 27 at 9. It additionally asserted at the hearing that a ruse does not invalidate consent. It contends that trickery and deceit are permitted so long as it does not deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

Gallegos's counsel argued at the hearing that Newman knew he was telling Gallegos something that would "overbear his will" when he made up the ruse about needing to search for child pornography, given the circumstances of the case. He notes in his briefing that Gallegos "was a 20 year old living in poverty, his mother was an illegal alien engaged in illegal activities with her boyfriend, so they lived in a shadow world. He clearly did not consider what may be on the phone for the same reasons earlier cited: he was scared and did not believe he could refuse the agents' requests." Dkt. 26 at 26.

"[T]rickery and deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 424, 106 S. Ct. 1135 (1986)). Newman told Gallegos that he wanted to search the phone to make sure there was not anything like child pornography on the phone because he was going to be entrusted to take custody of his sibling or siblings. At the hearing, Newman admitted this was a ruse and that he made up this reason so that Gallegos would let him look at the phone; he was hoping to find evidence that would aid in the case relating to the alleged illegal activity of Gallegos's mother. If there had been information on the phones relating to those activities, there may be more inquiry

into whether the trickery rendered the consent involuntary. But, instead, what was found was exactly what Newman told Gallegos he was looking for.

That does not, however, end the coercion inquiry. Gallegos also indicates in his declaration that he was concerned about being allowed to take custody of his sibling, and the ruse Newman admits he used certainly would have made a reasonable person think that he or she had to let the police check out the device so that CPS would not take the kids, particularly since the agents brought CPS along with them when executing the search warrant on the mother's house. Any reasonable person who was faced with a concern that his or her sibling may be taken to CPS if he or she did not allow a search of the phone would feel a need to allow the search. This factor is not determinative, but it weighs in Gallegos's favor.

### 3. The Extent and Level of Gallegos's Cooperation with the Police

The next factor is the level of Gallegos's cooperation. *Jenkins*, 46 F.3d at 451. The Government argues that Gallegos was very cooperative, consented both verbally and in writing, and even agreed to drive to HSI to continue the interview and search of the second phone. Dkt. 27 at 9. Gallegos argues that his "cooperation was limited to his belief he had no choice but to do as asked." Dkt. 26 at 25.

All of the agents who testified at the hearing who were present at the house said that Gallegos was very cooperative. The only evidence that came to light during the hearing that may indicate otherwise is the suggestion that Gallegos possibly took his iPhone off of the evidence table and put it in his pocket. But, even if he did so, he was extremely cooperative when he was seen looking at the phone and the agent asked him about it. The fact that Gallegos felt he *had* to cooperate does not

diminish the fact that he did cooperate; his belief regarding whether he had to cooperate is measured in the fourth factor. The cooperation factor weighs in the Government's favor.

### 4. Gallegos's Awareness of the Right to Refuse

The fourth factor is whether Gallegos was aware he had the right to refuse to consent. *Jenkins*, 46 F.3d at 451. The Government asserts that Newman went over the form with Gallegos, which informed Gallegos of his right to refuse consent, and that Gallegos read the form himself and ultimately signed it. Dkt. 27 at 9; *see* Dkt. 32 (Gov't Ex. 1). Gallegos contends in his declaration that when he signed the form he was "still frightened, surrounded by many armed agents, my mother was arrested, so I did not think I had the choice to refuse. I was not allowed to speak to my mother or anyone else for advice. I was presented with a form and I signed it where I was shown to sign." Dkt. 26, Ex. 1. When the iPhone was found, Gallegos contends in his declaration that he again "did not think [he] could refuse and [he] agreed." *Id.*

While Gallegos contends he did not realize he could refuse, the form clearly informed him that he could refuse. There was credible testimony at the hearing that Gallegos read the consent form. This factor weighs in the Government's favor.

### 5. Gallegos's Education and Intelligence

The fifth factor is Gallegos's level of education and intelligence. *Jenkins*, 46 F.3d at 451. The Government points out that Gallegos was able to intelligently communicate with the agents and did not have any issues understanding what they were saying. Dkt. 27 at 10. Additionally, at the hearing the Government noted that Gallegos was going to college and was very cooperative and calm. Gallegos's arguments all relate to the psychological impact of the situation rather than any deficits in Gallegos's intelligence or education level.

One of the agents testified that Gallegos was going to college in Dallas and that his mother said he was her most responsible child. There is no indication that Gallegos was not educated or smart enough to understand what was going on. This factor weighs in the Government's favor.

**6.      Gallegos's Belief That No Incriminating Evidence Will Be Found**

The final factor is Gallegos's belief that no incriminating evidence would be found. *Jenkins*, 46 F.3d at 451. The Government noted at the hearing that Gallegos knew that there was no incriminating evidence on the gray Samsung, which is the first phone he consented for the Government to search. The Government argued that Gallegos likely knew that there was incriminating evidence on the iPhone, which is why it was later in his pocket rather than on the evidence table. Gallegos simply contends that he did not consider what was on the phones because he did not believe he had a choice but to consent. Dkt. 26 at 26. .

Gallegos contends in his declaration that he thought the officers were just going to look through his contacts (Dkt. 26, Ex. 1), so he possibly believed no incriminating evidence would be found. Of course, since Newman testified that he told Gallegos he was looking for child pornography and the use of this ruse was credibly corroborated by other agents who testified, it is not plausible that Gallegos did not think there would be some examination of his photo gallery. And the testimony that Gallegos had placed the iPhone, which is the phone containing the incriminating videos, back in his pocket further substantiates that Gallegos may have feared incriminating evidence would be found. After considering the evidence *in toto*, the court finds that this factor weighs slightly in favor of the Government.

While certainly Gallegos was in a stressful situation and it is reasonable to believe that he did not believe he could ethically refuse to consent because his mother was in trouble and needed

his help with his siblings, and he likely did not want CPS to take custody of his siblings, he knew he had a right to refuse consent, and the agents were not going to prevent him from leaving if he chose to do so. It was clear from the testimony that Gallegos was not exhibiting any signs of emotional duress when he consented, and he intelligently communicated with agents. Gallegos appears to have put his concerns about his siblings' welfare or his mother's wishes above his concerns about what may be found on the iPhone, which suggests that he had a reason to consent outside of generally being cooperative, but it does not make his consent to search the iPhone involuntary. After considering the totality of the circumstances, the court finds that Gallegos's consent to search his car and the two cell phones was freely and voluntarily given, at least with regard to a manual search on the date the agents had physical custody of the cell phones.

**B.     Scope of Consent**

Whether Gallegos consented to the scope of the search performed is a separate issue. Does signing a general consent to search a cell phone allow the Government to download the data from the cell phone onto a device, keep this data *ad infinitum*, and go through it at the Government's leisure? Additionally, should a defendant, upon seeing his device hooked up to some kind of machine, have known the Government would be doing more with his data than it would have if the agents had been thumbing through the cell phone itself? If so, does the defendant have a burden, if he did not intend to consent to the Government downloading the data onto a device, keeping the data *ad infinitum*, and going through it at its leisure, to withdraw his consent?

The parties have provided no cases regarding whether a conducting a forensic search of a cell phone's data at a later date after the cell phone has been returned to the defendant impedes a defendant's privacy interests when the defendant signed a general consent to search form, and the

court has found none.  However, the following caselaw relating to the right of privacy in materials found on cell phones and the scope of consent, generally, informs the court's analysis.

### 1.    Increased Privacy Interest in Cell Phones: *Riley v. California*

In *Riley v. California*, the U.S. Supreme Court considered a case in which the State of California wished to use evidence obtained from a defendant's cell phone that was seized from the defendant's pocket during an arrest.  573 U.S. 373, 134 S. Ct. 2473 (2014).  The arresting officer initially accessed information on the phone and noticed concerning words in either the text messages or contacts list.  *Id.* at 379.  When they got to the police station, a detective specializing in gangs found additional evidence on the phone.  *Id.*  The defendant was charged with crimes associated solely with the evidence obtained on the phone, and the defendant moved to strike that evidence. *Id.* at 379.  He contended that the search of the cell phone, incident to arrest, violated the Fourth Amendment because the search was performed without a warrant and not pursuant to exigent circumstances.  *Id.*  The trial court denied the motion to suppress, and the defendant was convicted. *Id.*  The California appellate court affirmed, and the California Supreme Court denied the defendant's petition for review.  *Id.* at 380.  The U.S. Supreme Court, however, granted certiorari. *Id.*

The U.S. Supreme Court began its analysis by noting that the "'ultimate touchstone of the Fourth Amendment is "reasonableness."'" *Id.* at 381 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943 (2006)).  It then discussed its Fourth Amendment jurisprudence and, particularly, the exception that had been crafted to the warrant requirement when a search is incident to an arrest.  *Id.* at 382.  The Court considered "how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the

proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id.* at 385. The Court noted that under its prior search incident to arrest jurisprudence, it must assess "on the one hand, the degree to which" the search "intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *Id.* It reasoned that following this rule mechanically "might well support the warrantless search[] at issue here," but the rule's rationale did not have "much force with respect to digital content on cell phones." *Id.* at 386.

The Court ultimately held that "officers must generally secure a warrant before conducting" a search of a cell phone incident to arrest. *Id.* It reasoned that prior cases allowing warrantless searches incident to arrest for officer safety did not apply because "[d]igital data stored on a cell phone cannot itself be used as a weapon to harm an arresting officer or to effectuate the arrestee's escape." *Id.* at 387. It found, thus, that the "interest in protecting officer safety does not justify dispensing with the warrant requirement across the board." *Id.* at 388. It similarly found that its jurisprudence justifying warrantless searches incident to arrest to prevent destruction of evidence did not justify accessing cell phone data without a warrant, as officers were free to seize and secure cell phones while seeking a warrant. *Id.* at 388–91. Finally, the Court pointed out that the search incident to arrest exception is based not only on the aforementioned safety and evidentiary concerns, but also on the fact that "an arrestee has diminished privacy interests," which has been used to justify searches of personal items carried by the arrestee, such as a purse or a wallet. *Id.* at 392.

In reaching the decision that a search warrant must be obtained to search the contents of a cell phone when the phone is seized incident to arrest, the Court found that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's

person." *Id.* at 393. It pointed out that cell phones are "in fact minicomputers that also happen to have the capacity to be used as a telephone" and have "immense storage capacity," and a cell phone with a 16-gigabyte storage capacity "translates to millions of pages of text, thousands of pictures, or hundreds of videos." *Id.* at 393–94. "The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." *Id.* at 394.

The Court posited that if a modern man's pockets contain a cell phone, then Judge Learned Hand's classic Fourth Amendment reasoning that it is completely different to search through a man's pockets than to ransack his house "is no longer true" as, "[i]ndeed, a cell phone search would typically expose to the government far *more* than an exhaustive search of a house." *Id.* at 396 (citing *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926)). The Court conceded that its decision to require warrants would impact the ability to combat crime, noting that "[p]rivacy comes at a cost." *Id.* at 401. The Court's holding is that warrants are generally required to search a cell phone even when it is seized incident to an arrest, but that "other case-specific exceptions may still justify a warrantless search of a particular phone." *Id.* at 401–02. Importantly, in reaching this conclusion, the Court instructed that

> [m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life." . . . The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.

*Id.* at 403.

Certainly *Riley* does not dictate that a warrant was required to search Gallegos's cell phone, as consent is one of the exceptions that, if freely and voluntarily given, justifies a warrantless search. But the *Riley* Court's reasoning informs the court's decision regarding whether a general consent is sufficient to conduct a forensic analysis at a later date. While a general consent is sufficient for most types of searches, is it sufficient for a forensic search of a cell phone—an object that differs in "both a quantitative and a qualitative sense from other objects that might be kept on an [an individual's] person"?

### 2. Limiting Scope of Consent

#### a. *Mendoza-Gonzalez*

This question, however, must be considered not only in the context of the increased privacy interest in cell phones espoused by the *Riley* Court but also in the context of prior caselaw relating to consent searches. In *United States v. Mendoza-Gonzalez*, 318 F.3d at 665, the Fifth Circuit considered whether Jose Gerardo Mendoza-Gonzalez who was driving a truck, was stopped at an immigration checkpoint, and consented to agents taking a look in the back of his trailer, had consented to the agents slicing the tape on one of the boxes in the back of the truck and looking inside. The box contained bricks of marijuana. *Mendoza-Gonzalez*, 318 F.3d at 665. Mendoza-Gonzalez argued that the search of the cardboard box exceeded the scope of his consent. *Id.* at 666.

The Fifth Circuit pointed out that the scope of consent is measured on a reasonableness basis but the "factual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." *Id.* at 667. It noted that under Supreme Court caselaw, officers do not have to separately ask permission to search each container in a vehicle they have received consent to search. *Id.* (citing *Jimeno*, 500 U.S. at 248).

28

The court stressed that the defendant who knew the contents of the vehicle had the responsibility of limiting the scope of the search. *Id.* (citing *McSween*, 53 F.3d at 688). The court found it important that the defendant did not object when the officer began to open the box. *Id.* While the defendant had only consented to the officer "taking a look" in the cab, the Fifth Circuit noted that allowing a "look in" a vehicle is "equivalent of a request for general consent to search." *Id.* at 668.

Mendoza-Gonzalez also argued that a reasonable person would not have expected the officer to look inside the boxes because the agents had led him to believe they were looking for *people*, and the boxes were too small to contain people. *Id.* at 668. The court found that the exchanges between the officers and defendant, when viewed through the lens of a reasonable observer, did not indicate that the officers were only interested in finding people in the truck. *Id.* Mendoza-Gonzalez had told the officers more than once that he was carrying cheese. *Id.* The court determined that an objective onlooker would believe the officers wanted to confirm that Mendoza-Gonzalez was carrying cheese. *Id.* at 669. However, in reaching this decision, the court instructed that when officers have "a general, limitless statement of consent, [they] do not have carte blanche over the domain where consent was given." *Id.* Rather, the "reasonableness superstructure of the Fourth Amendment still applies." *Id.*

Of relevance to the case at hand, the Fifth Circuit discussed the expectation of privacy with regard to a locked container. The Fifth Circuit had already determined that searching in containers of a vehicle was permissible when a general consent to search was received, and the defendant did not have to be informed about the purpose of the search. *Id.* at 669–70 (citing *Crain*, 33 F.3d at 480). In *Mendoza-Gonzalez*, the box was taped shut, but not locked. The court found that privacy interest in the taped box did not rise to the privacy interest in a locked container, which "require

specific knowledge of a combination, possession of a key, or a demonstration of significant force to open." *Id.* at 671. It found that the single piece of tape did not "send a particular message of privacy." *Id.*

Here, the iPhone was like a locked container, but, importantly, Gallegos *gave agents the password*. If a search of a cellphone is akin to an exhaustive search of a house, Gallegos essentially gave agents the keys. Of course, if one gives agents keys to search one's house, the time to search is finite.

### b. *United States v. Garcia*

In *United States v. Garcia*, the Fifth Circuit considered whether police officers who had been given a general consent to search a vehicle at a truck weigh station exceeded the scope of consent when they removed stereo speakers and found bundles of cocaine. 604 F.3d 186, 189 (5th Cir. 2010). The officers in *Garcia* did not express the object of the search. *Id.* at 190. The Fifth Circuit reiterated its reminder from *Mendoza-Gonzalez* that general consent does not "give an officer *carte blanche* over the vehicle," but found that since the officers in *Garcia* had asked the driver, Lee Garcia, if the vehicle contained anything illegal, it "was natural to conclude that they might look for hidden compartments or containers." *Id.* The court determined that Garcia knew the contents of the vehicle and it was his responsibility to "explicitly limit the scope of the search." *Id.*

In the case at bar, it was natural to conclude that the officers would want to look through the photos and videos in Gallegos's phone given the expressed object of the search. However, whether it was natural to conclude that they would continue searching after the phones had been returned and the custody decision made is a different question. It is clear that a reasonable person would expect the Government to look through the pictures and videos, and, under *Garcia*, Gallegos, knowing what

was on the iPhone, should have limited the scope of the search.  A reasonable person, seeing the phone hooked up to some kind of machine, would likely believe that the agents were making some kind of copy of the contents of the cell phone likely should have limited the scope of the search.  The question remains, however, would a reasonable person expect the Government to continue to look through the contents of the phone after it had been returned to its owner?  Did Gallegos have the obligation to say, "Hey, now that I have my phones back, you're going to delete any of my private information you have downloaded, right?"

        c.      *United States v. Jaras*:

In *United States v. Jaras*, which is a case Gallegos relies on for his argument that Gallegos did not have a burden to limit the scope of his consent when he saw his phone hooked up to the Cellebrite, the Fifth Circuit considered whether a district court erred when it held that Jose Jaras, who had been a passenger in a car that was stopped and searched pursuant to the consent of the driver, had impliedly consented to the search of his suitcase in the trunk because he did not object when the officer searched it.  86 F.3d 383, 390 (5th Cir. 1996).  The Fifth Circuit held that Jaras's consent could "not be inferred from Jaras's silence and failure to object because the police officer did not expressly or implicitly request Jaras's consent prior to the search." *Id.* at 390.  This case, however, is not helpful here, as the police in *Jaras* never obtained consent from Jaras initially. Inferring consent from the outset is completely different than expecting somebody to speak up if they consented and later want to limit that consent.

### 3.     Scope of Consent for Forensic Searches

#### a.     *United States v. Cotterman*

The final case that the court will discuss because it is instructive is *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc), which is a *pre-Riley* en banc Ninth Circuit case relating to border searches or cell phones. Border searches form "'a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause.'" 709 F.3d at 959 (quoting *United States v. Seijan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc)). Because these searches occur at the border, they are generally considered reasonable when viewing the totality of circumstances. *Id.* at 960.

In *Cotterman*, Howard Cotterman's electronic devices were initially searched at the United States-Mexico border while Cotterman waited to enter the country. *Id.* The court noted that it had in the past approved "quick look[s]" and "unintrusive search[es] of laptops" at the border, and it had no issue with the initial search. *Id.* However, the defendant's laptop was retained, and a forensic examination followed. *Id.* at 961. The Ninth Circuit noted that a laptop can contain "warehouses full of information," including "the most intimate details of our lives: financial records, confidential business documents, medical records and private emails." *Id.* at 964. It reasoned that "the uniquely sensitive nature of data on electronic devices carries with it a significant expectation of privacy and thus renders an exhaustive exploratory search more intrusive than with other forms of property." *Id.* at 966.

In *Cotterman*, the Government made copies of the hard drives, and it took days before they found any contraband, which, like the case at hand, was child pornography. *Id.* The court recognized the "important security concerns" at the border as well as the legitimate concerns about

child pornography, but found that these concerns did "not justify unfettered crime-fighting searches or an unregulated assault on citizens' private information." *Id.* The court therefore crafted a solution requiring reasonable suspicion before conducting a forensic examination of a computer searched at the border.[9] *Id.*

This case does not answer the question of whether it was reasonable when giving consent for a search of a cell phone to believe the Government could make a copy and perform an intrusive forensic search after returning the phone itself, since the Government actually kept the computer in *Cotterman*, but it highlights the principle, later solidified in *Riley,* that there is an increased privacy interest when the Government is doing this type of search on a cell phone or computer. The case thus lends credence to Gallegos's argument that the consent form in such a case should be more specific with regard to what the Government is being given access to do with the data.

**b.** ***United States v. Long***

The Government cites *United States v. Long*, 425 F.3d 482, 484 (7th Cir. 2005), a pre-*Riley* case, for the proposition that it is not unconstitutional to conduct a forensic search with a general consent form. Setting aside the fact that *Long* is pre-*Riley*, the consent form in *Long* stated "that the

_____

[9] It is important to note that *Cotterman* is merely persuasive authority. The Fifth Circuit has not addressed whether it would require reasonable suspicion for an intrusive forensic search of an electronic device originally searched at the border. In *United States v. Molina-Isidoro*, 884 F.3d 287 (5th Cir. 2018), it noted that no federal case had required a *warrant* for border searches post-*Riley*, but that two federal cases, including *Cotterman*, had required reasonable suspicion for intrusive forensic searches. 884 F.3d at 293. The search in *Molina-Isidoro* was a manual search of a phone, not a forensic search, and the Fifth Circuit rested its holding on the good-faith exception. *Id.* ("[I]t was reasonable for the agents to continue to rely on the robust body of pre-*Riley* caselaw that allowed warrantless border searches of computers and cell phones."); *see also United States v. Kolsuz*, 8980 F.3d 133, 148 (4th Cir. 2018) (citing *Molina-Isidoro* for the proposition that it was "reasonable for the CBP officers who conducted the forensic analysis of Kolsuz's phone to rely on the established and uniform body of precedent allowing warrantless border searches of digital devices that are based on at least reasonable suspicion").

officers were authorized to remove and search any documents and property 'including but not limited to computer hardware, software, and all other external media storage.'" 425 F.3d at 487. This is far more specific than the consent form in this case, and certainly a reasonable person would believe that the Government was planning to use some type of forensic software as part of its search.[10] Additionally, the testimony in the *Long* case indicated that agents told Long that there were allegations of his having illegal materials in his possession. *Id.*

4.      **Analysis and Conclusion Regarding Scope**

The court first notes the U.S. Supreme Court's warning in 2001 in *United States v. Kyllo*: "It would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology." *United States v. Kyllo*, 533 U.S. 27, 33–34 (2001). Certainly, the degree of privacy in cell phones is not completely unaffected. The question the court has grappled with in analyzing the above-noted caselaw is how much? And, of course, what would a reasonable person expect?

---

[10]    Gallegos proposes a form that can be found in the Department of Justice publication *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*, which is published by the Office of Legal Education Executive Office for United States Attorneys. *See* Dkt. 26-2, Exs. 6–7. The form is specific to searches of electronic devices, and includes the following paragraph:

> I relinquish any constitutional right to privacy in these electronic devices and any information stored on them. I authorize [insert Agency/Department] to make and keep a copy of any information stored on these devices. I understand that any copy made by [insert Agency/Department] will become the property of [insert Agency/Department] and that I will have no privacy or possessory interest in the copy.

*Id.*, Ex. 7. While the court cannot issue an advisory opinion regarding the Constitutionality of a forensic search if a form like this were used, it likely would dramatically change the scope-of-consent analysis in this case.

In light of the authorities discussed and in consideration of the totality of the circumstances, the court finds that Gallegos freely and voluntarily consented to the search of his iPhone. Because he saw an agent hook his Samsung up to a device at the house and knew that they still had the iPhone when they went to the HSI office, a reasonable person would have believed his data was being downloaded, and under the precedent discussed, it was Gallegos's responsibility to limit the scope of consent to a manual search at that time. The court finds Newman's testimony that a more specific consent form would "unnerve" the person signing and that he expects individuals to just withdraw consent when they see their phones being hooked up to the Cellebrite troubling,[11] but the court agrees generally that a reasonable person who saw his or her phone hooked up to this machine would expect that the agents were downloading data from the phone for some purpose.

However, there is a Constitutional concern regarding whether the scope of Gallegos's consent extended past the time his cell phones were returned to his physical possession and he was no longer going to be taking custody of his siblings. In other words, there is an issue with what a reasonable person in this situation would expect the Government was going to do with the data. The court finds that this is a close call that must be resolved in favor of upholding the privacy rights secured by the

---

[11] The troubling aspect of this statement was highlighted by defense counsel during closing arguments, who likened the Government's defense of its consent form to a famous quote, somewhat paraphrased, from *The Treasure of Sierra Madre* that later became even more popular in the film *Blazing Saddles*: "Badges, we don't need no stinkin' badges." *See* Correction: 'Stinking Badges' and Movies, NPR (Sept. 7, 2007), https://www.npr.org/templates/story/story.php?storyId=14238525 (*The Treasure of Sierra Madre*: "Badges? We ain't got no badges. We don't need no badges. I don't have to show you any stinking badges.") (*Blazing Saddles*: "Badges? We don't need no stinking badges."). Defense counsel suggested that the Government agents would simply replace the word "badges" with "forensic consent": "Forensic consent, we don't need no stinkin' forensic consent." Of course, the Government *does* need knowing and voluntary consent that a reasonable person would believe includes a forensic search or at least understands has been transformed into a forensic search and has the opportunity to limit. Or, in more colloquial terms, some form of stinkin' forensic consent.

Founding Fathers.  The court thus holds, in light of the *Riley* Court's finding that there is an increased privacy right in smart cell phones and in consideration of the totality of the circumstances of this particular case, that continuing the search after the iPhone was returned to Gallegos and the purpose of the search that was relayed to him—to make sure there were no issues with his taking custody of the children—was no longer at issue, exceeded the scope of Gallegos's consent.  It was reasonable to believe that the Government was finished perusing through Gallegos's data at that time, and the general consent form was insufficient to alert Gallegos that the Government was going to keep the data and go through it at its leisure.  Allowing the Government to keep the intimate data available on modern cell phones indefinitely and search through it at any time without obtaining voluntary consent for such an extensive dive into a person's "privacies of life" runs contrary to the Fourth Amendment's guarantee that a person has to right to be secure in his or her "person[], house[], papers, and effects."  U.S. Const. amend. IV.

## C.  Sufficiency of Search Warrant

Gallegos also argues that the warrant obtained by Wilfong was inadequate and the evidence obtained as a result should be suppressed because the search warrant affidavit was not particular as to the place to be searched, and the Fourth Amendment requires "particularly describing the place to be searched."  U.S. Const. amend. IV.  The Government contends that the information contained in the affidavit regarding child pornography being on a particular iPhone and the belief that the iPhone was in the possession of the defendant was sufficiently particular as to location.

The affidavit and search warrant in this case indicated that an iPhone with a specific serial number was to be searched and specified what types of images and data should be searched on that iPhone.  *See* Dkt. 32-1, attachs. A–B.  This is a particular description of the "place to be

searched"—the parts of the mobile device that contain photos and images. *Cf. In re Nextel Cellular Telephone*, No. 14-MJ-8005-DJW, 2014 WL 2898262, at *9 (D. Kansas June 25, 2014) ("In one sense, the government has already indicated the particular place to be searched—the iPhone with a specific IMEI number."); *In re the Search of Apple iPhone, IMEI 013888003738427*, 31 F. Supp. 3d 159, 166 (D.D.C. 2014) (noting that "[i]n a broad manner, describing the iPhone and its specific IMEI number certainly describes the 'place to be searched' in a particular manner" but requiring a sufficient search protocol).[12]  Moreover, Wilfong stated that he expected the phone to be on or near Gallegos because individuals with a sexual interest in children "often keep their collections close to them and protect them from being discovered by others."  Dkt. 32-1 (search warrant affidavit).  He specifically stated in the affidavit that the phone would be "in the custody of Cristopher Jose GALLEGOS-Espinal."  *Id.*  And he asserted there was "probable cause to believe the offenses described within this affidavit," which describes the material found on the iPhone, "are currently located on the TARGET DEVICE."  *Id.*

The court finds that the affidavit provided the Magistrate with a substantial basis to conclude that probable cause existed that evidence of a crime would be found in the images areas of the iPhone with the specified serial number, which would be found in the possession of Gallegos. Additionally, the warrant, which provides the serial number and states that the items to be searched or seized are images/videos as well as the data indicating whether they were created, uploaded or

---

[12]  In *In re Nextel Cellular* and *In re the Search of Apple iPhone*, which both required specification of search protocols in the warrants, the concern was that there was no indication of which blocks of the devices should be searched.  *See, e.g.*, *In re the Search of Apple iPhone*, 31 F. Supp. 3d at 167.  Here, the warrant specifies that the items to be searched are images, videos, and data as to when and where those files were created, which necessarily indicates that the "where" on the phone is the locations where images and videos are stored.

installed, is particular as to location as required by the Fourth Amendment since the "location" of the images and videos is on this specific iPhone.

**D.     Good Faith Exception**

The Government argues that even if the court were to find that consent was defective thus tainting the search warrant affidavit or it determined that there was insufficient probable cause to issue the search warrant, the evidence obtained as a result of the search warrant should not be suppressed because the officers executing the search warrant for the iPhone acted in good faith. Dkt. 27.  Gallegos contends that the good faith exception cannot save the evidence because (1) the data was illegally downloaded based on insufficient consent; (2) this illegally obtained data was used to apply for a deficient search warrant; and (3) the agent used the knowledge gained from the illegal search and seizure to repeatedly confront Gallegos until he made admissions.  Dkt. 26.  Gallegos argues that this is an unbroken string of inappropriate and illegal actions by the agents and the admissions by Gallegos are "fruit of the poisonous tree" and must be suppressed.  *Id.*

The court begins by acknowledging that "[g]ood faith is not a magic lamp for police officers to rub whenever they find themselves in trouble," *United States v. Zimmerman*, 277 F.3d 426, 438 (3d Cir. 2002), and that "[c]ourts should resist the temptation to frequently rest their Fourth Amendment decisions on the safe haven of the good-faith exception, lest the courts fail to give law enforcement and the public the guidance needed to regulate their frequent interactions, *United States v. Molina-Isidoro*, 884 F.3d 287, 293 (5th Cir. 2018) (Costa, J., specially concurring).  However, the U.S. Supreme Court fashioned the good faith exception for a reason, as there are times when exclusion is not appropriate because there is a "'dissipation of taint'" and the "detrimental consequences of illegal police action becomes so attenuated that the deterrent effect of the

exclusionary rule no longer justifies its cost.'" *United States v. Leon*, 468 U.S. 897, 911 104 S. Ct. 3405 (1984) (quoting *Brown v. Illinois*, 422 U.S. 590, 609, 95 S. Ct. 2254 (1975) (Powell, J., concurring in part)). The U.S. Supreme Court, in adopting the good faith exception, noted that even if the exclusionary rule "effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919.

The Fifth Circuit discussed the interaction of the good faith exception and the exclusionary rule extensively in *United States v. Massi*, explaining that the "good faith exception does not resolve whether a constitutional right has been violated; it simply is a judicial determination that exclusion of evidence does not advance the interest of deterring unlawful police conduct." 761 F.3d at 525. The *Massi* court determined that two requirements must be met for evidence that resulted from fruit of the poisonous tree to be admissible: "(1) the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant must be 'close enough to the line of validity' that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct, and (2) the resulting search warrant must have been sought and executed by a law enforcement officer in good faith as prescribed by *Leon*." *Id.* at 528.

The court looks to the Fifth Circuit's discussion in *United States v. Molina-Isidoro* for guidance as to the first prong—whether the conduct was close enough to the line of validity. In *Molina-Isidoro*, the Fifth Circuit declined to address the Fourth Amendment question because it found that agents who searched a phone at the border acted with an objectively reasonable belief that

their conduct did not violate the Fourth Amendment. 884 F.3d at 290. The case dealt with a border search doctrine, which has traditionally allowed searches at the border without any suspicion, and nonroutine searches with, at most, reasonable suspicion. *Molina-Isidoro*, 884 F.3d at 291. The Fifth Circuit pointed out that "no court has ever required a warrant to support searches, even nonroutine ones, that occur at the border." *Id.* at 292. The defendant argued that *Riley* had "change[d] all that," but the Fifth Circuit noted that notwithstanding *Riley*'s heightened privacy interest in smart cell phones, *Riley* "left open the possibility that 'other case-specific exceptions may still justify a warrantless search of a particular phone.'" *Id.* (quoting *Riley*, 573 U.S. at 590–91). The Fifth Circuit thus concluded that it was reasonable for agents to continue to rely on pre-*Riley* case law allowing warrantless border searches of cell phones and computers. *Id.*; *see also, e.g.*, *United States v. Wanjiku*, 919 F.3d 472, 486 (7th Cir. 2019) (noting that agents "possessed an objectively good faith belief that their conduct did not violate the Fourth Amendment" "[g]iven the state of the law at the time of the[] searches of the contents of [the defendant's] electronic devices"). Here, similarly, while the court believes a more specific consent form would be appropriate post-*Riley*, the agents testified that they have used that same consent form for all types of cases, and it was not unreasonable for the agents to rely on the same procedure post-*Riley*, especially given the *Riley* Court's discussion of "other case-specific exceptions." 573 U.S. at 401–02. The court thus finds that conducting the forensic search in reliance on Gallegos's signing a general consent form was "close enough to the line of validity" for the court to consider applying the good-faith exception.

The court now turns to a general determination of whether the good faith exception should apply under *Leon*. First, was Judge Palermo, who issued the search warrant, misled by information in an affidavit that Wilfong knew or reasonably should have known when applying for the warrant

40

was false?  The answer is no.  Wilfong was not present when the data was downloaded from the cell phones.  His search warrant affidavit indicates that had spoken with law enforcement agents who were present, and Gallegos agreed to the search and signed a consent form.  Dkt. 32-1 (search warrant affidavit).  Gallegos then wrote the password for the iPhone (or provided the password) on the consent form, and data was extracted in his presence before the phone was returned to Gallegos.[13]  *Id.*  Based on this information, it was reasonable for Wilfong to believe that Gallegos had freely and voluntarily consented to the data extraction.  And, in fact, Wilfong credibly testified at the hearing that he was "100 percent" that he was basing his investigation off of a consent that was freely and voluntarily given.

Next, under *Leon*, the court must determine whether the issuing magistrate wholly abandoned her judicial role.  There is no argument in this case that Judge Palermo abandoned her judicial role.

The third *Leon* factor is whether the warrant affidavit is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.  With the exception of the argument that the affidavit is deficient because it did not list a geographic location for the cell phone, no one argues that the search warrant affidavit is defective on its face.  The affidavit states that Gallegos consented to the search.  And the court has found that the location information is sufficient.  So, it was certainly reasonable for the Magistrate and Wilfong to believe there was probable cause.

---

[13] The court notes that Wilfong's search warrant affidavit states that the data form the *iPhone* was extracted in Gallegos's presence before the phone was returned to him.  Dkt. 32.1.  However, the testimony at the hearing of the agents who were involved in the search indicates that only the data from the gray Samsung was extracted in Gallegos's presence.  This inaccuracy in the affidavit represents Wilfong's understanding of the facts and does not change the analysis, as there would have been a "substantial basis for . . . concluding that probable cause existed" (*Jones*, 362 U.S. at 271) even if Wilfong had understood that only the data from the gray Samsung was extracted in Gallegos's presence and the data from the iPhone was extracted later at the office while Gallegos was being interviewed in a separate area.

The fourth *Leon* factor—whether the warrant is so facially deficient in failing to particularize the place to be searched or the things to be seized that executing officers cannot reasonably presume it to be valid—also is not at issue if the geographic location argument fails, as the warrant itself provides the cell phone's serial number and specifies the "location" on the cell phone to search and what may be seized from that location. Thus, none of the *Leon* factors preclude the good faith exception in this case.

Because the *Leon* factors do not preclude a finding of good faith and an objectively reasonable officer preparing the search warrant affidavit would not have been suspicious regarding the consent, the court finds that it is appropriate to apply the good-faith exception in this case. While the court certainly believes it is appropriate for DHS to change its consent form when it intends to do a forensic search in light of *Riley*, that does not denigrate the fact that Wilfong appropriately relied on the consent form and that no binding authority has required more detailed consent.

## IV. CONCLUSION

The motion to suppress the materials found on the iPhone is GRANTED because the scope of consent did not encompass the forensic search conducted at a later date.

The motion to suppress the statements Gallegos made to agents after the search warrant was obtained as "fruits of the poisonous tree" is DENIED under the good faith exception.

Signed at Houston, Texas on May 23, 2019.

_____
Gray H. Miller
Senior United States District Judge

42